## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

LYNNE M. SHERIDAN, WILLIAM RÍOS,
AND THE LEGAL CONJUGAL
PARTNERSHIP BETWEEN THEM,

**Plaintiffs**

**v.**

CENTERRA GROUP, LLC,

**Defendant**

CIVIL NO. 19-2036 (PAD)

### OPINION AND ORDER

Delgado-Hernández, District Judge.

William Ríos was discharged from his employment as an armed security officer with Centerra Group, LLC ("Centerra"), after falling asleep while on duty at an entrance to a hangar of helicopters, planes, equipment, and offices of the United States Coast Guard at Air Station Borinquen in Aguadilla, Puerto Rico. Disagreeing with the employer's action, he, his spouse, and their legal conjugal partnership, sued Centerra under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA") and Puerto Rico law,[1] alleging that Centerra discriminated against Mr. Ríos on the basis of disability, subjected him to a hostile work environment, impermissibly retaliated against him, and violated the Puerto Rico Constitution (Docket No. 11). Before the court is Centerra's motion for summary judgment (Docket No. 24), which plaintiffs opposed (Docket No.

---

[1] Specifically, Puerto Rico Law 44 of July 2, 1985, P.R. Laws Tit. Ann. 1, § 501 et seq. ("Law 44"); Law 115 of December 20, 1991, P.R. Laws Ann. tit. 29, § 194 et seq. ("Law 115"); Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141; and Article II, §§ 1, 8 and 16 of the Puerto Rico Constitution, P.R. Laws Ann. tit. 1 (Docket No. 11).

40). Centerra replied (Docket No. 46). For the reasons explained below, Centerra's motion for summary judgment is GRANTED and the case DISMISSED.

## I.    SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "bears the initial responsibility" of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A factual dispute is "genuine" if it could be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). It is "material" if it potentially affects the outcome of the case in light of applicable law. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

As to issues on which the nonmovant has the burden of proof, the movant "need do no more than aver" absence of evidence to support the nonmoving party's case. Mottolo v. Fireman's Fund Insurance, 43 F.3d 723, 725 (1st Cir. 1995). All "reasonable factual inferences" must be drawn in favor of the party against whom summary judgment is sought while ignoring conclusory allegations and unsupported speculation. Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013). Based on these parameters, a thorough review of the record shows no genuine factual dispute as to the facts identified in the section that follows and in Section III.

## II.    FINDINGS OF FACT

### A.    Preliminary Observations

Except otherwise noted, the facts included in this Section are drawn from the well-pleaded facts asserted in the Amended Complaint (Docket No. 11) and the parties' Local Rule 56 submissions

(Docket Nos. 23, 24, 38, 40, 44 and 46).  Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."  CMI Capital Market Inv. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008).  It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by specific citations to the record, that the movant contends are uncontested and material.  Local Rule 56(b) and (e).  The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph.  Id. 56(c) and (e).  While the district court may "forgive" a violation of Local Rule 56, litigants who ignore the rule do so "at their peril." Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 219 (1st Cir. 2007).[2]  Here, the court has reviewed every factual statement and counterstatement that the parties submitted plus supporting exhibits, and it has included in this Opinion and Order those facts that are material to the case and that were incorporated in statements that comport with summary judgment principles.[3]

### B.   The Parties

Centerra is a federal contractor that provides armed security-officer services for U.S. Coast Guard facilities in Aguadilla.  See, SUMF ¶ 1.  Mr. Ríos was employed as an armed security officer at Centerra between September 14, 2018, and March 2, 2019.  See, SUMF ¶¶ 3-4. He was hired on an "as needed" basis.   See, SUMF ¶ 3; "Opposing Statement of Uncontested Facts"

---

[2] A number of plaintiffs' responses to Centerra's "Statement of Uncontested Material Facts" (Docket No. 23)("SUMF") go beyond admitting, denying or qualifying facts and citing to record evidence.  Those responses include argumentation and even caselaw.  For example, plaintiffs' response to SUMF ¶ 9 includes reference to caselaw.  See, Docket No. 39, pp. 1-2, 5-6.  Additionally, in the response to SUMF ¶¶ 31, 32 and 33, plaintiffs argue as to the merits of denying summary judgment.  See, Docket No. 39, pp. 9-10.  Plaintiffs' response to SUMF ¶¶ 52 and 53 even quotes to the Equal Employment Opportunity Commission's guidance on diabetes and the ADA.  See, Docket No. 39, p. 11.  This is not the proper way to respond to a SUMF.

[3] The court will disregard statements or responses that rely on conclusory or argumentative language without appropriate factual support from the record.  See, Mancini v. City of Providence, 909 F.3d 32, 44 (1st Cir. 2018)("It is hornbook law that a plaintiff cannot avoid summary judgment by relying solely on conclusory allegations").

("OSUMF")(Docket No. 38), ¶¶ 10, 16.  In the first two days of his employment he received on-the-job training for a total of eight hours, going through the different functions that were expected of him.  See, Mr. Ríos' Deposition Transcript (Docket No. 23-2), pp. 38, 39, 48.  Two of his supervisors were Lieutenant William López and Sergeant Gerald Ramos.  See, SUMF ¶ 6.  They, in turn, reported to Captain Víctor Caraballo, the Project Manager for Centerra's operations at the Coast Guard base in Aguadilla.  See, SUMF ¶ 2; OSUMF ¶ 23.

### C.   Job Assignments

As an armed security officer, Mr. Ríos could be assigned to various locations or "posts" within the base, including the Coast Guard Exchange –a shopping area known as the "PX" or "CGX"– the Ramey School, the teacher's parking lot gate and the aircraft hangar, among others.  See, SUMF ¶¶ 8, 9, 15, 16; OSUMF ¶ 17.  He could also do a "meal break" shift, where he would cover other guard's meal breaks and use his vehicle to move between the posts.  See, SUMF ¶¶ 17-18; OSUMF ¶ 18.  While assigned to a post, Mr. Ríos generally had to validate visitor identifications and vehicle registrations (proper identification is required to enter the Coast Guard's facilities) and patrol the assigned area.  See, SUMF ¶¶ 9, 16; OSUMF ¶¶ 20, 21, 28.

### D.   The Rest House Incident

On or around October 19, 2018, Mr. Ríos was in a building designated for use as a rest house by Centerra personnel.  See, SUMF ¶ 19.  According to Mr. Ríos, he used the rest house to check his blood glucose levels, and to use the bathroom and to change.  See, Docket No. 23-2, p. 73. The bathroom is on the second floor.  Id.  That day, as Mr. Ríos was coming out of the bathroom,

Sgt. Ramos thought that Mr. Ríos was in his underwear, and told him that he could not be in underwear in the house.  See, SUMF ¶ 19; Docket No. 23-2, p. 76.[4]

### E.     **Reprimand**

On December 18, 2018, a civilian drove up to the Coast Guard Exchange entrance post while Mr. Ríos was assigned to the post.  See, SUMF ¶¶ 20-21; Docket No. 23-2, p. 136.  The civilian had a gun in the vehicle and Mr. Ríos asked him for it.  Docket No. 23-2, p. 136.  The civilian gave Mr. Ríos the gun and magazine.  Id. at p. 137.  Mr. Ríos called for assistance and did not get a response.  Id. at p. 138. Then, he called another Centerra Security Officer.  Id.  The "CGX Armed Guard Post Order" is a document posted at the PX guard booth with a set of instructions on what the Coast Guard expects the security guards to do while at the post.  See, SUMF ¶ 10.  The Post Order states that "*if the Guard believes the situation is developing so as to warrant a partner, the Guard should call for back up by contacting the Shift Supervisor (first choice) or Duty Security (second choice) or Security Chief (third choice.).*"  SUMF ¶ 23.  Mr. Ríos testified that he was aware of the Post Order.  See, SUMF ¶ 11.  Capt. Caraballo investigated the incident, recommending that Mr. Ríos be reprimanded.  Id. at ¶ 24.  On December 24, 2018, Mr. Ríos received a letter of reprimand for retrieving, handling, and unloading another person's firearm.  See, SUMF ¶¶ 24-26; Docket No. 23-16.[5]

---

[4] According to Mr. Ríos, he was not in his underwear but in a pair of shorts (Docket No. 23-2, p. 76).

[5] Plaintiffs deny SUMF ¶ 24, claiming in part that the supporting document –a report prepared by Capt. Caraballo (Docket No. 23-16)– is not authenticated.  But they rely on pre-2010 amendments to the Federal Rules of Civil Procedure to argue that defendant was required to authenticate the exhibit by affidavit, which is incorrect.  Before 2010, Fed. R. Civ. P. 56(e) provided that "[i]f a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."  See also, Foreword Magazine, Inc. v. OverDrive, Inc., 2011 WL 5169384, *1 (W.D.Mich. Oct. 31, 2011)("Former Rule 56(e) contained an unequivocal direction that documents presented in connection with a summary judgment motion must be authenticated.").  The 2010 amendments removed this language.  After the 2010 amendments, Rule 56(c)(1) states that a party must support its assertions of fact or dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

### F.   The Meal Relief Post

On December 20, 2018, Mr. Ríos was assigned to the meal relief post on which he had to

cover the 20-minute meal breaks of different guards.  See, SUMF ¶ 43.  Going from the first post to

the second post, Mr. Ríos saw Sgt. Ramos following him.  Id.  In the second post, Sgt. Ramos asked

Mr. Ríos what was taking him so long, offered him doughnuts, which Mr. Ríos declined, and left.

Id. at ¶¶ 43-44.  Mr. Ríos did not see Sgt. Ramos again for the rest of the shift.  Id. at ¶ 44.

### G.   Mr. Ríos' Complaints About Sgt. Ramos

In December 2018, Mr. Ríos wrote two letters complaining about Sgt. Ramos, one on

December 20, 2018, the second on December 22, 2018.  See, SUMF ¶ 41; OSUMF ¶ 54; Docket

No. 23-13.  In the first letter, Mr. Ríos states that Sgt. Ramos should "learn to confront situations

more professionally + respectfully."  Id.  In the second letter, Mr. Ríos complained about his

interaction with Sgt. Ramos during the meal break shift discussed above.  See, SUMF ¶ 45; OSUMF

¶ 60.  Capt. Caraballo and Robert Handel, Sr. Manager of Human Resources for Centerra,

investigated Mr. Ríos' complaints, concluding that there was no harassment.  See, SUMF ¶ 54.

### H.   Meeting with Capt. Caraballo

In late December 2018 or early January 2019, Mr. Ríos met with Capt. Caraballo in

connection with the alleged harassment.  See, Docket No.23-2, p. 153.  They both spoke with Mr.

Handel over the phone.  Id.  Mr. Ríos mentioned his health conditions and Mr. Handel instructed

Capt. Caraballo to give Mr. Ríos a form for Mr. Ríos to provide to his doctor, so that Centerra could

---

interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  And "a party may object that the material cited to
support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).
Thus, the rule now "makes no such affirmative [authentication] requirement, placing upon the adverse party the burden
to raise an objection" that the evidence or fact cannot be presented in a form that would be admissible at trial.  Int'l
Shipping Agency, Inc. v. Unión de Trabajadores de Muelles Loc., 2015 WL 5022794, *3 (D.P.R. Aug. 21, 2015).

determine whether Mr. Ríos needed any accommodation.  Id. at 154-155.  Capt. Caraballo left the

document for Mr. Ríos in the housing main gate clipboard.  See, SUMF ¶ 52.  Mr. Ríos did not

follow up with Capt. Caraballo about the document.  See, SUMF ¶ 53.

### I.      Sleeping on the Job

On February 23, 2019, Mr. Ríos was assigned to the post in the hangar, where the Coast

Guard had offices and kept helicopters, planes, and equipment.  See, SUMF ¶¶ 28-29.  At

approximately 8:30 a.m., Lt. López stopped by the hangar post and asked Mr. Ríos if everything

was okay and if he needed a break, to which Mr. Ríos responded that everything was fine, that he

had brought a few things to the post and was okay.  See, SUMF ¶ 30; Docket No. 23-7, p. 2.  At

around 9:35 a.m., Lt. López drove up to the hangar entrance to relieve Mr. Ríos for his meal break

and saw that Mr. Ríos had dozed off while on duty.  See, SUMF ¶¶ 31-32.

Lt López saw Mr. Ríos asleep with his head down and fingers interlocked.  Id.  As Lt. López

waited, Mr. Ríos reacted awake.  See, SUMF ¶ 32.  Lt. López asked Mr. Ríos if he was okay and

Mr. Ríos said he was writing and then that he was reading, even though he did not have a book in

front of him.  See, SUMF ¶ 33.  Mr. Ríos did not ask for medical care or a doctor.  See, SUMF ¶

34; Docket No. 23-2, p. 148.  On the contrary, he said, "Why am I going to lie, yeah I fell asleep I

got so much going on."  See, Docket No. 23-7, p. 1.  The day before this incident, Mr. Ríos had

worked a six-hour shift, from 1:00 p.m. to 7:00 p.m.  See, SUMF ¶ 35.  Lt. López sent Mr. Ríos to

the Main Gate and then released him from duty.  Thereafter, he was not assigned additional shifts

pending the outcome of the ensuing investigation.  See, SUMF ¶ 36.

### J.      Investigation and Termination

Capt. Caraballo investigated the incident, obtaining reports from both Lt. López and Mr.

Ríos.  See, SUMF ¶ 37.  Upon conclusion of the investigation, Capt. Caraballo recommended that

Mr. Ríos be terminated for sleeping on duty.  Kristian Kluzinski, Centerra's Director of North

America Operations, agreed with the recommendation.  See, SUMF ¶ 38.  Centerra's

Administration of Discipline Standard Operating Procedure provides that sleeping on duty is

conduct that merits dismissal as a first offense.  See, SUMF ¶ 40.

## III.   DISCUSSION

Plaintiffs allege that Centerra discriminated against Mr. Ríos because of disability; failed to

provide a reasonable accommodation to him; and created a hostile work environment in violation

of ADA and Law 44 (Docket No. 40, pp. 11, 13, 21).  Further, they assert that Centerra unlawfully

retaliated against Mr. Ríos in violation of ADA and Law 115.  And they aver that Centerra infringed

on Article II, §§ 1, 8, and 16 of the Puerto Rico Constitution.  Id. at pp. 29-30.

### A.    Discrimination Under the ADA and Law 44

The ADA makes it illegal for employers to discriminate against "a qualified individual with

a disability because of the disability of such individual in regard to . . . terms, conditions, and

privileges of employment."  Freadman v. Metropolitan Property and Cas. Ins. Co., 484 F.3d 91, 99

(1st Cir. 2007).  For its part, Law 44 was enacted on July 22, 1985 "to prohibit discrimination

against disabled individuals by any public or private institution" receiving funds from the

Commonwealth of Puerto Rico.  Arce v. ARAMARK Corp., 239 F.Supp.2d 153, 168-169 (D.P.R.

2003 (citing Statement of Motives of Law 44).

Following promulgation of the ADA, the Puerto Rico Legislature enacted Law 105 of

December 20, 1991, with the express purpose of "extending Law 44's protection to persons

employed by private institutions in Puerto Rico and to conform Law 44 to the ADA."  Aramark,

239 F.Supp.2d at 168-169 (citing Statement of Motives of December 20, 1991).  Thus, modeled

after the ADA, Law 44 is "Puerto Rico's counterpart" to the ADA.  Ortiz-Martínez v. Fresenius

Health Partners, LLC., 261 F.Supp.3d 276, 283 (D.P.R. 2016).   In this way, the statutes are "conterminous."  González v. El Nuevo Día, 304 F.3d 63, 74 n. 8 (1st Cir. 2002).  And that being so, Law 44 requires "no separate analysis."  Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 81 n. 4 (1st Cir. 2008); González, 304 F.3d at 74 n. 8 (affirming dismissal of conterminous claim under Law 44 upon dismissal of ADA claim).

Where, as here, a plaintiff does not have direct evidence of disability animus, he may rely on the "burden-shifting framework" set in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Mancini, 909 F.3d at 38.  The goal of this framework is to progressively "sharpen the inquiry into the elusive factual questions of intentional discrimination."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  With this in mind, the plaintiff "must first establish a prima facie case of discrimination."  Mancini, 909 F.3d at 38.

If a prima facie case is established, a rebuttable presumption of discrimination arises, switching to the employer the burden of articulating a "legitimate, nondiscriminatory reason" for the action at issue.  LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993).  This is a burden of production, not of persuasion, such that the employer is merely required to set forth through the introduction of admissible evidence, reasons for its action "which would support a finding that unlawful discrimination was not the cause of the challenged employment action." Sánchez v. Puerto Rico Oil Co., 37 F.3d 712, 720 (1st Cir. 1994).  An articulation not admitted into evidence "will not suffice."  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 n. 9 (1981).

Should the employer satisfy this burden, the inference arising from the prima facie phase "drops from the case."  White v. Vathally, 570 F.Supp. 1431, 1434 (D. Mass. 1983).  In that instance, the sole remaining issue "is discrimination *vel non,*" which comes front and center.  Vélez

v. Thermo King de Puerto Rico, Inc. 585 F.3d at 441, 447 (1st Cir. 2009).  To carry the devoir of persuasion on this ultimate issue, the plaintiff must identify probative evidence that the reason given by the employer for its action is pretextual, that is, not its true reason, but a pretext for discrimination.  Id.  As such, this last step "merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination," Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000), a burden that, incidentally, remains with the plaintiff "at all times." Burdine, 450 U.S. at 253.

From these principles, to establish a prima facie case of disability discrimination, a plaintiff must show that he (1) was disabled within the meaning of the statute; (2) was qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) was discharged or otherwise adversely affected, that is, suffered an adverse employment action "in whole or in part" because of his disability.  López-López v. Robinson School, 958 F.3d 96, 104 (1st Cir. 2020).  As to these elements, like Centerra, the court assumes that Mr. Ríos was disabled under the ADA.  Unlike Centerra, however, it also assumes that Mr. Ríos was qualified to perform the essential functions of the job with or without reasonable accommodation.[6]

Shifting lenses to the adverse action component of the framework, plaintiffs mention that Sgt. Ramos admonished Mr. Ríos not to park his car near the rest house (Docket No. 23-2, pp. 83-85); not to walk on his underwear in that house (id., at p. 76); and not to consume snacks at his post (id., p. 71). They state that Sgt. Ramos spied on Mr. Ríos (id., at pp. 72, 80) and followed him while he was working the meal break shift (id., at p. 125).  And they bring up that neither Capt. Caraballo

---

[6] According to plaintiffs, Mr. Ríos has been diagnosed with asthma, hyperlipidemia, diabetes type 2 mellitus, obstructive sleep apnea, obesity and hypertension (Docket No. 38, ¶ 4).  Further, they allege that the diabetes, neuropathy, hypertension, obesity and sleep apnea affect Mr. Ríos' major daily activities of walking, eating, working, standing, concentrating and sleeping.  Id. at ¶ 5.

nor Sgt. Ramos assisted Mr. Ríos in the firing range (id., at pp. 128-131, 157); and that Mr. Ríos was reprimanded for having retrieved a loaded firearm from a civilian (id., at p. 134) and was terminated for sleeping on the job (Docket No. 38-1, p. 5).   Only the termination qualifies as an adverse action.

An adverse action is one that is materially adverse in that it carries "tangible consequences." Gómez-Pérez v. Potter, 452 Fed.Appx. 3, 8 (1st Cir. 2011).   At bottom, it involves discrete changes in the terms of employment such as "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Morales-Valladares v. Potter, 605 F.3d 27, 35 (1st Cir. 2010).   Whether an employment action is materially adverse is gauged by an objective standard.   Id.   An employee's displeasure at an action, standing alone, does not render it materially adverse.   Gómez-Pérez, 452 Fed.Appx. at 8.   Within this category fall the shooting range dynamics, Sgt. Ramos' admonitions to Mr. Ríos about not parking in a visitor's spot near the rest house, on not being in underwear in that house, and over not consuming snacks on working posts.[7]

As well, employer criticism is "an ordinary and appropriate feature of the workplace." Figueroa-Carrasquillo v. Axiscare Health Logistic, Inc., 2018 WL 8619913, *13 (D.P.R. Jul. 30, 2018).   It can "prompt an employee to improve his performance, and thus lead to a more constructive employment relationship." Reyes-Feliciano v. Marshalls, 159 F.Supp.3d 297, 305 (D.P.R. 2016).   For that reason, counseling, reprimands, and warnings "are a proper instrument for management to focus employees' attention on the need to correct some workplace behavior that the employer perceives as needing correction." Fernández-Ocasio v. Walmart Puerto Rico, Inc., 94

---

[7] As will be discussed below, Mr. Ríos consumed snacks notwithstanding what Sgt. Ramos allegedly told him and was never disciplined over it.

F.Supp.3d 160, 173 (D.P.R. 2015).  And they are not materially adverse unless they carry tangible consequences.  See, Bhatti v. Trustees of Boston University, 659 F.3d 64, 73 (1st Cir. 2011)(explaining that critical memoranda and reprimands without tangible consequences are not considered materially adverse); Fernández-Ocasio, 94 F.Supp.3d at 173 (observing that job-related criticism unaccompanied by tangible consequences are not materially adverse).  To this category belongs the reprimand that Mr. Ríos received for retrieving the loaded firearm.

In the same way, "extreme supervision and snubbing" do not satisfy the adverse action prong.  Gómez-Pérez, 452 Fed.Appx. at 8; Hicks v. Rubin, 6 Fed.Appx. 70, 73 (2nd Cir. 2001)(pointing out that constant monitoring and workload reviews do not constitute materially adverse employment actions); Godoy v. Mapplehurst Bakeries, Inc., 747 F.Supp.2d 298, 314 (D.P.R. 2010)(noting that although close monitoring may cause an employee embarrassment and anxiety, "such intangible consequences are not materially adverse alterations of employment conditions").  They are not so, even if combined with an increased workload.  See, Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 23-25 (1st Cir. 2002)(the fact that plaintiff was required to do more work under extreme supervision did not rise to level of an adverse employment action).[8]  To this category corresponds Mr. Ríos' claim that Sgt. Ramos spied on him and followed him during a meal-break shift.

In contrast, as previously mentioned, the termination is considered an adverse employment action.  To this extent, plaintiffs may be said to have established a prima facie case of discrimination

---

[8] See also, Higgins v. TJX Companies, Inc., 331 F.Supp.2d 3, 5-7 (D. Me. 2004)(Hornby, J.)(that plaintiff was cited for not staying in her work area and counseled for misusing break periods and wearing open-toe shoes in violation of employer's dress code; one of her supervisors "hollered at her" and walked around the employment site (a store) with another employee and "stared at her" while she was working; once, she worked for six hours without a break; and supervisor threatened to reduce her work hours for being on the telephone asking another employee a work-related question, did not rise to the level of an adverse employment action).

under the ADA and Law 44.   Nevertheless, Centerra has put forward a legitimate, non-discriminatory reason for its action, namely, that Mr. Ríos slept on the job.  See, Oglesby v. Hy-Vee, 214 Fed.Appx. 829, 834 (10th Cir. 2007)(sleeping on the job is a legitimate nondiscriminatory reason for terminating an employee); Reed v. Amas Coal Co., 971 F.2d 1295, 1299-1300 (7th Cir. 1992)(upholding discharge of plaintiff under Title VII of the Civil Rights Act of 1964 for seeping on the job).

Proceeding to the ultimate burden, plaintiffs did not establish that the reason Centerra provided for its decision is a pretext to discriminate against Mr. Ríos because of his disability. Pretext means something worse than business error.  It means deceit, "a lie."  Collazo-Rosado v. Univ. of Puerto Rico, 765 F.3d 86, 97 (1st Cir. 2014).  Its analysis is "more demanding" than the assessment of whether a prima facie case has been established.  Mariani-Colón, 511 F.3d at 222.  It moves the inquiry to "a new level of specificity," Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003), focusing the analysis on "the perception of the decisionmaker," Lahens v. AT&T, Mobility Puerto Rico, Inc., 28 F.4th 325, 335 (1st Cir. 2022).

On this account, a plaintiff must show that the decision-maker did not believe that the reason asserted for the employer's action was real.  See, Ronda-Pérez v. Banco Bilbao Argentaria—Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005)(applying formulation)(citing in part Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996)("[T]he issue is not whether [the employer's reasons . . . were real, but merely whether the decisionmakers . . . believed them to be real").  Correspondingly, plaintiff needs to "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: [prohibited] discrimination." Lahens, 28 F.4th at 335.

This may be accomplished in a number of ways, including with evidence that "similarly-situated employees outside of [plaintiff's] protected class were treated differently," Windross v. Barton Protective Services, Inc., 586 F.3d 98, 104 (1st Cir. 2009); that the employer "deviated inexplicably from one of its standard business practices," Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 68 (1st Cir. 2008); or of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for termination such that a reasonable factfinder could find them unworthy of credence" and infer that the employer did not act on the ground asserted for the actions, Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 124 (1st Cir. 2011).

Plaintiffs point out that two officers –Carlos Torres and Heriberto González– fell asleep and were not terminated (Docket Nos. 38, ¶¶ 108-109; 40, p. 11). To be probative of pretext, the difference in treatment requires "a showing that the employees were similarly situated in all relevant aspects." Woodward v. Emulex Corp., 714 F.3d 632, 639 (1st Cir. 2013). But what plaintiffs have come up with does not satisfy this requirement. To begin, plaintiffs claim that Officer Cortés told Mr. Ríos that Officer Torres had suffered an epileptic attack –from which Mr. Ríos guesses that Torres went into convulsions– and that Cortés went to aid Torres and saved his life (Docket No. 23-2, pp. 160-162).

From that description, Officer Torres was in a life-threatening condition. Nonetheless, the record is devoid of evidence that Mr. Ríos faced a similar life-threatening event when he fell asleep. Moreover, there is no timeframe for when Officer Torres suffered the epileptic attack other than that it occurred before Mr. Ríos was employed by Centerra (Docket No. 23- 2, p. 161), and there is no indication of who were the decision-makers involved in determining what to do over the incident. Similarly, Mr. Ríos' allegation is that the incident took place during Officer Torres' "work

shift" (Docket No. 11, ¶ 52). However, as the evidence in this case shows, a work shift in Centerra included meal breaks as well as active work (see, SUMF ¶ 43), and there is no evidence on whether Officer Torres was working or on break. Thus, plaintiffs failed to show that Officer Torres and Mr. Ríos were similarly situated.

As for Officer González, plaintiffs state that Officer Valentín told Mr. Ríos that a few months after he was let go, González had fallen asleep at the Ramey School twice, but the first time he got a slap on the wrist and the second time was suspended (Docket No. 23-2, p. 162). Mr. Ríos does not know if Officer Valentín was present when González supposedly fell asleep. Id. at p. 164. And there is no evidence that Officer Valentín personally saw González sleeping. Overall, the record is silent on how Officer Valentín acquired knowledge of what Mr. Ríos said that he told him, which creates a problem, not of hearsay as Centerra says, but of cognizance.

Pursuant to Fed. R. Civ. P. 56(c)(2), evidence has to be presented in a form "that would be admissible" at trial. Presumably, Officer Valentín could have testified at trial, but would have had to accredit personal knowledge to testify about this matter. See, Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). And along the same line, Fed. R. Civ. P. 56(c)(4) states that "[a] declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence and show that the . . . declarant is competent to testify on the matters stated." Yet, it is apparent that Officer Valentín's declaration does not satisfy these requirements. In consequence, it is not possible to show that Mr. Ríos and Officer González are similarly situated.

In relation to what Mr. Ríos has referred to as "the second time" that Officer González fell asleep (Docket No. 23-2, p. 162), the record includes an incident report, to the effect that he was

inattentive to duty but not asleep (Docket No. 38-9, p. 3).  Plaintiffs have not brought forth any evidence to place the report's finding in controversy, a fact that does not advance their cause, for an employee claiming differential treatment must show that those with whom he seeks to be compared "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Trajan v. Wayfair Maine, LLC, 957 F.3d 54, 62 (1st Cir. 2020).

Plaintiffs contend that Centerra did not follow its own protocol in making the termination decision, for in their view, there is no evidence that Mr. Ríos' termination was approved by appropriate authorities such as the Senior Vice President or designee and coordinated through Centerra's Corporate Human Resources (Docket Nos. 38, ¶ 123; 40, p. 29;).  Nevertheless, the evidence shows that Mr. Handel –Sr. Manager of Human Resources– and Mr. Kluzinski–Centerra's Director of North America Operations– were involved in the termination decision.  See, Docket Nos. 23-3, ¶ 15; 44-2, Responses 4 and 10.  Plaintiffs did not explain, much less show, why the involvement of these executives in the decision-making process and termination makes the decision in question pretextual.

In all, the evidence does not reflect "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's offered reason for termination, that a treasonable factfinder could rationally find it unworthy of credence and hence permissibly infer "that the employer did not act" on the nondiscriminatory ground asserted for its action.  Lahens, 28 F.4th at 335.  Nothing in the record suggests that Centerra did not honestly believe that Mr. Ríos fell asleep while on duty and terminated his employment on that basis.  See, Leibforth v. Belvidere Nat. Bank, 337 F.3d 931, 934 (7th Cir. 2003)(summary judgment dismissing discrimination action of plaintiff who failed to establish that employer did not honestly believe the proffered reason for

the challenged actions). To boot, there is no discernible evidence that Mr. Ríos was disparately treated in the instances of non-adverse actions referred to earlier.[9]

First, plaintiffs allege that Mr. Ríos was not allowed to park his car in the visitor spots near the rest house but that other officers were allowed to do so (Docket No. 38, ¶ 40). The evidentiary support they provide for the statement is that on one occasion, Mr. Ríos saw Sgt. Ramos talking to another officer who was standing next to a car that was parked in that same visitor's spot (Docket No. 23-2, pp. 83-86). Mr. Ramos believes that the car he saw belonged to the officer because he observed him talking to people with the car door open. Id. at p. 86.[10] Properly considered, though, this account does not reasonably support the inference that the car he referred to belonged to the officer or that even if it did, confirms that other officers were routinely allowed to park in those spaces. In fact, Mr. Ríos acknowledged that at times "they" let officers park there, and sometimes they did not. Id. at p. 85.[11]

Second, plaintiffs allege that Lt. López prohibited Mr. Ríos from using the bedroom in the rest house but that other officers were allowed to use it (Docket No. 23-2, p. 75). Mr. Ríos said that the officers slept there overnight and between shifts. Id. But there is no indication in the record that Mr. Ríos was in the same situation, that is, that he needed to use the room to sleep overnight or between shifts and was not granted permission to use the room for those purposes.

---

[9] Strictly speaking, non-adverse actions are not part of the prima facie case calculus. Still, the court addresses them for plaintiffs' benefit.

[10] Mr. Ríos did not testify that the other officer was not admonished. See, Docket No. 23-2, pp. 83-86.

[11] Mr. Ríos testified that instead of parking the car in those spaces, he parked outside the PX (Docket No. 23-2, pp. 83, 203), which according to him, was "not close." Id. at 85. In spite of that, he provided no objective measure, approximation or estimate of the distance between the rest house and the PX, leaving the court out to speculate about it.

Third, plaintiffs allege that in early December 2018, a former coworker stopped by the guard post and gave Mr. Ríos coffee and a snack (Docket No. 23-2, pp. 96, 98). Then, Corporal Méndez pulled up with Sgt. Ramos, Sgt. Ramos got out of the car, and among other things, told Mr. Ríos that he could not consume anything at the post. Id. at p. 97. Mr. Ríos expressed to have told Sgt. Ramos that he needed to consume something to control his blood glucose levels, and that Sgt. Ramos responded that Mr. Ríos only worked four hours. Id. at pp. 97-99. Plaintiffs assert that other officers were allowed to consume snacks in their posts. Yet, Mr. Ríos admitted that he was also allowed to have snacks at his post and continued doing so without being bothered by anyone. Id. at pp. 224-225.[12]

Fourth, plaintiffs allege that Sgt. Ramos ignored Mr. Ríos at a shooting range during an off-duty practice (Docket No. 23-2, pp. 128-131) and that Capt. Caraballo did not assist him during a tactical shooting qualification exercise. Id. at 157-160. There is no evidence that Mr. Ríos asked for Sgt. Ramos' or Capt. Caraballo's assistance. In any event, in the off-duty practice, Mr. Ríos received assistance from another officer. Id. at pp. 128, 130. And according to Mr. Ríos, at the end of the shooting qualification exercise, the instructor told Capt. Caraballo of Ríos' health condition and Capt. Caraballo asked Mr. Ríos if he was okay (Docket No. 38-1, p. 6). Mr. Ríos approved the exercise. See, Docket No. 23-2, p. 166.

Fifth, plaintiffs allege that although Mr. Ríos was reprimanded for handling a loaded gun, another officer –Juan Arce– was not (Docket No. 40, p. 12). The record shows that on June 29, 2018, Officer Arce was assigned to the PX post when an individual drove up to the gate requesting access to the premises. See, SUMF ¶ 56. Officer Arce observed that there was a rifle in the

---

[12] Mr. Ríos testified that he could not remember if Capt. Caraballo told him "yes" or "no" about eating while working on the post, but that Lt. López would tell him to get a drink or something to snack and allowed him to consume it on the post (Docket No. 23-2, p. 100).

passenger seat and inquired if the person had a permit.  Id.  The person claimed to have forgotten it

and left.  Id.  Officer Arce then contacted USCG Security Duty and Military Enforcement Officer

McGuire responded.  Id.  The driver returned and claimed that the rifle was no longer in the car and

again attempted to enter the PX area base.  Id.  Officer McGuire contacted the local police

department, that located the armed and unattended rifle not far away from the entrance.  Id.

Contrary to what Mr. Ríos had done, at no time Officer Arce handled the firearm or instructed the

individual to hand over the weapon.

Finally, plaintiffs allege that an employee with less seniority than Mr. Ríos received priority

in shift assignments (Docket No. 23-2, p. 195).  Mr. Ríos identified that employee as "Vargas."  Id.

No evidence was provided on whether Vargas was disabled, which precludes relying on him as

comparator to support a claim under ADA and Law 44.  Further, as Mr. Ríos described the issue,

Mr. Vargas "is like Captain Caraballo's friend, and he comes to shifts."  Id.  To extrapolate a

disability animus from this setting is too great a stretch.  At worse, Mr. Ríos account reflects

cronyism.  But that would not make it prohibited discrimination.

Employment discrimination statutes like the Age Discrimination in Employment Act of

1967 and Title VII do not outlaw that type of practice.  See, Foster v. Dalton, 71 F.3d 52, 56 (1st

Cir. 1995)(taking notice that while cronyism is deplorable, Title VII does not outlaw it); López-

López, 958 F.3d at 110 (observing that while perhaps unsavory, cronyism is not age-based

discrimination).  Even more, Mr. Ríos stated that once he said yes to a shift, the shift would be

changed and given to Vargas (Docket No. 23-2, pp. 200-201).  It is unclear how many times this

happened and what its effect was, as it is apparent that, notwithstanding this situation, Mr. Ríos did

get shifts.  Bottom line, there is no allegation or expression of monetary loss.  The court would have

to engage in conjecture to identify tangible consequences flowing out of this event other than mere

inconvenience to Mr. Ríos, and mere inconvenience is insufficient to sustain a claim. In consequence, the disparate treatment claim must be dismissed.

B.     **Reasonable Accommodation**

Plaintiffs argue that Centerra failed to provide Mr. Ríos with reasonable accommodation (Docket No. 40, p. 13). The ADA's definition of discrimination includes an employer's failure "to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business. Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 127 (1st Cir. 2017). To establish a claim for failure to accommodate, a plaintiff must produce sufficient evidence for a reasonable jury to find that "(1) [he] made a sufficient request of accommodation, the accommodation would enable [him] to perform the essential functions of his job, and the accommodation is facially reasonable." Benson v. Wal-Mart Stores E., L.P., 14 F.4th 13, 28 (1st Cir. Sep. 15, 2021).

The record is devoid of evidence from which a reasonable jury could conclude that Mr. Ríos requested an accommodation. During Mr. Ríos' deposition, Centerra's counsel directly inquired about whether, in the meeting that Mr. Ríos had with Capt. Caraballo and Mr. Handel, who participated over the phone, Mr. Ríos asked for a specific accommodation (Docket No. 23-2, p. 155).[13] Mr. Ríos' unambiguous response was, "No, there was no specific accommodation." Id. Likewise, even though plaintiffs complain that Centerra should have accommodated Mr. Ríos during the tactical shooting qualification exercise (Docket No. 39-1, p. 6), it is undisputed that Mr. Ríos did not request any accommodation (Docket No. 23-2, pp. 157-160).

---

[13] The question was: "But I just want to understand. At that meeting, did you ask Mr. Handel, Handel, I am sorry, and Captain Caraballo for a specific accommodation?" (Docket No. 23-2, p. 155, ln. 19-22).

An employer cannot refuse to make an accommodation "that it was never asked to make." Dooley v. JetBlue Airways Corp., 636 Fed.Appx. 16, 18 (2nd Cir. 2015).   No employee can reasonably expect the employer to read his mind and know that he secretly wants an accommodation.   See, Murray v. Warren Pumps, LLC, 821 F.3d 77, 85-86 (1st Cir. 2016)(noting that the employer has no duty to divine the need for an accommodation); Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046-1047 (6th Cir. 1998)(pointing out that the employer is not required to speculate as to the extent of the employee's desire or need for an accommodation).

Plaintiffs maintain that Mr. Ríos told Mr. Handel and Capt. Caraballo about his medical conditions when he spoke with them in late December 2018 or early January 2019 (Docket No. 23-2, p. 154).   However, just telling Capt. Caraballo and Mr. Handel about medical conditions does not constitute a request for accommodation.   Knowing that an employee has health problems "is not the same as knowing that the employee suffers from a disability."   Brown v. BKW Drywall Supply, Inc., 305 F.Supp.2d 814, 829 (S.D. Ohio 2004).   And even a statement by an employee that he is disabled, without more, "is insufficient to constitute a request for accommodation."   Bielich v. Johnson & Johnson, Inc., 6 F.Supp.3d 589, 617 (W.D. Pa. 2014).[14]   An accommodation request must be specific, direct, and linked to a disability.   Calero-Cerezo, 355 F.3d at 23 ("The request for accommodation must be sufficiently direct and specific, giving notice that [the employee] needs a special accommodation").   But that is not what the record here shows.[15]

---

[14] See also, Echevarría, 659 F.3d at 187 ("Evidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability").

[15] Plaintiffs argue that had Centerra complied with Mr. Ríos' request to allow him to consume snacks to control his blood glucose levels, he would not have fallen into a diabetic shock and doze off while on duty.   See, Docket No. 40, p. 1).   The argument finds no record support.   First, despite what Sgt. Ramos allegedly told Mr. Ríos about not consuming snacks, Mr. Ríos did it anyway.   See, Docket No. 23-2, pp. 224-225.   Second, Mr. Ríos admitted that Lt. López allowed him to have snacks (id., p. 100) and it was Lt. López who supervised Mr. Ríos on that day.   Third, at approximately 8:35 a.m. on that same day, Lt. López asked Mr. Ríos if everything was okay, and if he needed a break, to which Mr. Ríos responded that everything was fine and that he had brought a few things to the post and was okay.

Plaintiffs posit that Centerra failed to engage in an interactive process with Mr. Ríos (Docket No. 40, p. 18). The interactive process requires "both the employer and the employee to engage in a meaningful dialogue, in good faith, for the purpose of discussing alternative reasonable accommodations." Ortiz-Martínez v. Fresenius Health Partners PR, LLC, 853 F.3d 599, 605 (1st Cir. 2017). It is triggered by the employee's "initial request for accommodation." Calero-Cerezo, 355 F.3d at 24. Where a breakdown in the process occurs, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008). An employer "cannot be found to have violated the ADA when responsibility for the breakdown of the informal, interactive process is traceable to the employee and not the employer." E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014).

From this perspective, assuming that the meeting between Mr. Ríos, Capt. Caraballo and Mr. Handel triggered Centerra's duty to engage in an interactive process, Centerra entered into the process by asking Mr. Ríos to take a form to his physicians. As Mr. Ríos describes the interaction, Mr. Handel wanted to get the doctor's notes so they could have an open-ended conversation to determine what type of accommodation Mr. Ríos would need (Docket No. 23-2, pp. 155-156). That was a reasonable first step to determine what accommodations could be given in this setting. See, Sturm v. UAL Corp., 2000 WL 1300396, *13 (D.N.J. Sept. 5, 2000)(reaching same conclusion under analogous circumstances).

---

See, SUMF ¶ 30. When Lt. López returned to relieve Mr. Ríos one hour later, he found him asleep. Mr. Ríos cannot fault Centerra for not having snacks. As well, plaintiffs have not submitted evidence that Mr. Ríos had a diabetic shock. He did not ask for medical assistance when Lt. López found him sleeping. That is what Lt. López saw and why Centerra terminated Mr. Ríos' employment. There is no evidence that Lt. López did not honestly believed what he saw.

Hence, Mr. Handel instructed Capt. Caraballo to give Mr. Ríos the document. Yet, plaintiffs observe that Capt. Caraballo never did so (Docket No. 23-2, p. 156). Indeed, he left the document for Mr. Ríos in the housing main gate clipboard. See, SUMF ¶ 52. Plaintiffs deny this fact, arguing that Mr. Hendel instructed Capt. Caraballo to give or notify the form to Mr. Ríos, and that leaving personal information documents related to Ríos' medical conditions so that other guards could see them violated the ADA and Mr. Ríos' right to privacy under the Puerto Rico Constitution (Docket No. 39, p. 11).[16]

The argument does not contradict the SUMF. First, an argument "is not fact." Mel Williamson, Inc. v. U.S., 1982 WL 36689, *1 (Ct. Cl. Feb. 2, 1982). Second, the quotation from the EEOC's technical assistance document has no bearing here, as the record is bereft of evidence that any of Mr. Ríos' coworkers knew he was participating in a process to evaluate accommodations. Third, in his deposition, Mr. Ríos did not invoke privacy as a reason for not having picked up the document. Rather, he said that it was Capt. Caraballo's responsibility to give it to him (Docket No. 23-2, p. 156). And that is why he never called Capt. Caraballo to inquire about the document. Id. at 156-157. However, it would not have been difficult for Mr. Ríos to follow up with Capt. Caraballo over the phone or by leaving a message for him in his office or through Lt. López.

---

[16] As support, plaintiffs quote the EEOC's technical assistance document "Diabetes in the Workplace and the ADA," at Q. 8, as follows: "**May an employer tell employees who ask why their co-worker is allowed to do something that generally is not permitted (such as eat at his desk or take more breaks) that she is receiving a reasonable accommodation?** No. Telling co-workers that an employee is receiving a reasonable accommodation amounts to a disclosure that the employee has a disability. Rather than disclosing that the employee is receiving a reasonable accommodation, the employer should focus on the importance of maintaining the privacy of all employees and emphasize that its policy is to refrain from discussing the work situation of any employee with co-workers. Employers may be able to avoid many of these kinds of questions by training all employees on the requirements of equal employment opportunity laws, including the ADA" (Docket No. 39, p. 11).

As mentioned earlier, the ADA envisions a process that requires "participation by both parties." Calero-Cerezo, 355 F.3d at 24.  The employer "may not know enough about the individual's disability or the limitations that disability would impose on the performance of the job" to suggest or implement an appropriate accommodation.  Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1136 (7th Cir. 1996)(cited with approval in Calero-Cerezo, 355 F.3d at 24). To fill the gap, the employer may ask for medical input to inform its judgment.  See, Ortiz-Martínez, 853 F.3d at 605 (describing as reasonable the employer's request for more specific information to help determine the type of accommodations that the employee required).  That is what Centerra did when it asked Mr. Ríos to provide it with his doctors' recommendations.  Correspondingly, conscious of what Mr. Handel was interested in, Mr. Ríos could have asked his physicians to confirm his alleged need for accommodations and propose accommodations for him.  But he never came forward with even a doctor's note.

In contrast, on February 25, 2018, at 9:36 p.m., some weeks after his meeting with Capt. Caraballo and Mr. Handel, Mr. Ríos sent Capt. Caraballo a memorandum about the incident of February 23, 2018, mentioning, among other things, that Capt. Caraballo was to provide him with a form to be filled out by his doctors, and that he was never given the form (Docket No. 23-8, p. 2). Capt. Caraballo responded less than 24 hours later, on February 26, 2018, at 4:45 p.m., indicating that the document had been placed in the Housing Main Gate clip board.  Id. at 1.  Mr. Ríos did not, however, pursue the topic any further with questions or requests for clarification.

On these facts, the court cannot conclude that Centerra infringed its responsibility to participate in good faith in an interactive process to identify potential accommodations for Mr. Ríos. See, Phelps v. Optima Health Inc., 251 F.3d 21, 28 (1st Cir. 2001)(explaining that employer was not responsible for breakdown in interactive process in part because it immediately began the

interactive process, returned letters promptly and generally acted in good faith); Steffes v. Stepan Co., 144 F.3d 1070, 1073 (7th Cir. 1998)(noting that employee failed to hold up her end of the interactive process by not clarifying the extent of her medical restrictions).

### C.    Hostile Work Environment

Plaintiffs contend that Centerra subjected Mr. Ríos to a hostile work environment based on his disability (Docket No. 40, pp. 21-22).  ADA-covered individuals "may assert hostile work environment claims premised on disability-based harassment."  Castro-Medina v. Procter & Gamble Commercial Co., 565 F.Supp.2d 343, 377 (D.P.R. 2008).  A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment."  Kosereis, 331 F.3d at 216 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

Whether an environment is hostile or abusive is determined by looking at the totality of circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  See, Harris, 510 U.S. at 23 (examining topic). To be actionable, the conduct must be both subjectively and objectively abusive.  Id.  Basically, plaintiffs argue that what has been presented as non-adverse actions plus other incidents to be described below, amount to a hostile work environment.  The events relate to Sgt. Ramos, Capt. Caraballo and Lt. López.[17]  To facilitate review, an outline of the incidents that plaintiffs base their claim on follows.

---

[17] In their memorandum of law, plaintiffs state that Sgt. Ramos subjected Mr. Ríos to a hostile work environment (Docket No. 40, p, 22).  In his deposition, Mr. Ríos also implicated Capt. Caraballo and Lt. López in that environment (Docket No. 23-2, pp. 186-187).  For completeness, the court will analyze both sets of allegations.

1. **Sgt. Ramos**.

| **(1)**. | October 19, 2018. | Sgt Ramos spied on Mr. Ríos in the rest house (Docket Nos. 23-2, pp. 73-74; 23-11, p. 1). |
|---|---|---|
| **(2)**. | Early November 2018. | Sgt Ramos told Mr. Ríos not to park in a visitor spot near the rest house (Docket No. 23-2, pp. 83-86). |
| **(3)**. | November 15, 2018. | Sgt. Ramos spied on Mr. Ríos in the Ramey School post (Docket Nos. 23-2, p. 89; 23-11, pp. 1-2). |
| **(4)**. | Early December 2018. | Sgt. Ramos told Mr. Ríos that he could not consume snacks on the work post because he worked four-hour shifts (Docket No. 23-2, pp. 96-99).[18] |
| **(5)**. | December 18, 2018. | Sgt. Ramos did not respond to Mr. Ríos radio calls during incident with the civilian and the loaded firearm (Docket No. 23-2, p. 117).[19] |
| **(6)**. | December 20, 2018. | During a meal-break shift, Sgt. Ramos followed Mr. Ríos between the first post and the second post (Docket No. 23-2, pp. 122-125). In the second post, Sgt. Ramos asked Mr. Ríos why it took him so long, offered him a doughnut and left. Id. at 126.[20] Mr. Ríos did not see him again that day. |
| **(7)**. | Early February 2019. | Sgt. Ramos did not assist Mr. Ríos during an off-duty shooting practice, albeit another officer assisted him (Docket No. 23-2, pp. 128-130). |

---

[18] According to Mr. Ríos, on that occasion, Sgt. Ramos also admonished him for wearing gaping clothes and having his shirt sticking out of his pants (Docket No 23-2, p. 97). Mr. Ríos said that he had received a small bullet proof vest and a small shirt, they kept coming out of his pants, and he tucked them in. Id.

[19] Mr. Ríos said that Officer Nieves told him that in another instance someone had called Sgt. Ramos for assistance, and Sgt. Ramos cursed ("¿qué estos cabrones quieren?" –roughly, "what do those mother----ers" want?")– because he did not want to be bothered (Docket No. 23-2, pp. 117-118). Mr. Ríos believes that Sgt. Ramos does not like to answer his radio. Id. at 116.

[20] Mr. Ríos expressed that Sgt. Ramos produced a box of doughnuts, and "mockingly" and with "a grin," told him to have a doughnut (Docket No. 23-2, p. 125).

| **(8)**. | <u>Unknown Dates</u>. | Sgt. Ramos scolded Mr. Ríos a few times claiming that he did not stop at the housing entrance check point and show his I.D. (Docket No. 23-2, pp. 193-194).  Mr. Ríos said Sgt. Ramos liked to scold people for that reason.  <u>Id</u>. |
|---|---|---|

All of these incidents are self-explanatory or have been described earlier, except for the three spelled out below.

### a.  **First Spying Incident**

Mr. Ríos testified that on October 19, 2018, he pulled up to the rest house to change and use the second-floor bathroom and heard footsteps coming up the stairs and then stop (Docket No. 23-2, p. 74).  He expressed that the stairs form an L, at the curvature of the L there is a platform and in there is the wall to the bathroom.  <u>Id</u>.  And he added that when he came out of the bathroom, he saw Sgt. Ramos with his ear against the wall.  <u>Id</u>.

With reference to the same incident, Sgt. Ramos reported in a statement to Capt. Caraballo, that he saw Mr. Ríos arrive and enter the rest house to change and take a meal/rest break (Docket No. 23-11, p. 1).  As time came closer for Sgt. Ramos to give Mr. Ríos and another officer their service weapons for the upcoming shift, Sgt. Ramos went into the house to verify if Mr. Ríos was all right.  <u>Id</u>.  The other officer told Sgt. Ramos that Mr. Ríos was upstairs and had been for a while. <u>Id</u>.  Then, Sgt. Ramos walked halfway to the staircase and called Mr. Ríos.  <u>Id</u>.  As Sgt. Ramos waited, he did not hear anything back.  <u>Id</u>.  He was going up the stairs again when, suddenly, Mr. Ríos came out in the hallway in his underwear, wearing no uniform.  <u>Id</u>.

Sgt. Ramos waited for Mr. Ríos in the guard shack, gave Mr. Ríos his weapon, and told him not to walk around the second floor like that (in other words, in his underwear), and if he was going to use the facilities, to keep it private because there were female cleaners and a secretary that worked

on the first floor for the janitorial team (Docket No. 23-11, p. 1).  Mr. Ríos does not dispute Sgt. Ramos' narrative except for Sgt. Ramos' location when Mr. Ríos came out of the bathroom –going up the stairs, as opposed to with his ear on the wall leading to the bathroom.[21]  Construing that discrepancy in plaintiffs' favor, it is hard to consider this as inappropriate behavior by Sgt. Ramos, much less as spying.

## b.  Second Spying Incident

On November 15, 2018, Mr. Ríos was assigned to the Ramey School Second Gate, and reported that his radio was not working (Docket No. 23-11, p. 1).  Sgt. Ramos searched for a battery to replace the one in Mr. Ríos' radio.  Id.  As Sgt. Ramos was driving through the exterior of the gate, he saw the gate closed and what appeared to be lights inside a vehicle next to the guard shack. Id.  When he got close to the vehicle, he saw that it was Mr. Ríos' vehicle, and that Mr. Ríos was inside.  Id.  Sgt. Ramos stood there so that Mr. Ríos could see him, and it took Mr. Ríos some time to notice Sgt. Ramos.[22]

Mr. Ríos said he was having a family issue and in response to the question of why the gate was closed, he said that there were no cars around and he was close by to make sure he left at the appropriate time (Docket No. 23-11, pp. 1-2).  Sgt. Ramos told Ríos that if he needed time to talk or resolve any issues or use his phone, he should make sure to let the shift supervisor know.  Id. Mr. Ríos expressed that Sgt. Ramos used the back entrance because there was a parking lot, the place was dark, and stood there and "watched" –or "spied"– on him (Docket No. 23-2, p. 87).  Like with the first incident, Sgt. Ramos did nothing improper.

---

[21] Mr. Ríos also said that Sgt. Ramos told him that he was sleeping when, according to Ríos, that was not true (Docket No. 23-2, p. 74).  Nothing came out of this.

[22] Mr. Ríos understands that he was not in the car for a long period (Docket No. 23-2, p. 89).

### c.  **Meal-Period Break Shift**

On December 20, 2018, Mr. Ríos was assigned to the meal-period break shift (Docket No. 23-2, p. 123).  Sgt. Ramos instructed him to cover the six guard posts in 2 and a half hours.  Id.  As Mr. Ríos left to cover the posts, he noticed that Sgt. Ramos was following him.  Id. at 124.  When Mr. Ríos arrived to the second post, Sgt. Ramos asked him what was taking him so long, offered him doughnuts and left.  Id. at 125-126.  Mr. Ríos did not see Sgt. Ríos again that day.  Id. at 126. In the main, from this factual description, Sgt. Ramos did not cross any line.

### 2.  **Capt. Caraballo; Lt. López**

Mr. Ríos stated that Capt. Caraballo never made any comment that would support a claim of hostile work environment (Docket No. 23-2, p. 186).  Likewise, as it concerns Lt. López, Mr. Ríos expressed that Lt. López never made any comment about Mr. Ríos' physical condition or disabilities.  Id.  at p. 187.  However, plaintiffs understand that the actions of Capt. Caraballo and Lt. López contributed to a hostile work environment, those actions being reprimanding Mr. Ríos for the handling of the loaded firearm in December 2018, not assisting Ríos in the firing range in February 2019, and terminating Mr. Ríos' employment in March 2019.

### 3.  **Analysis**

Workplace conduct "is not measured in isolation." Clark County School Dist. v. Breeden, 532 U.S. 268, 270 (2001).  Actions that are not materially adverse when considered individually may "amount to hostile work environment in the aggregate." Bhatti, 659 F.3d at 74.  Putting it all together, the record shows operational decisions with which Mr. Ríos did not agree and subjectively found hostile.  But they were not objectively so.  Conversations between an employee and his superior about his performance do "not constitute harassment simply because they cause the employee distress." Castro-Medina, 565 F.Supp.2d at 378.  Even constant work criticism in itself

is "not sufficient" to support a hostile work environment claim.  Lucenti v. Potter, 432 F.Supp.2d

347, 362 (S.D. N.Y. 2006).

Viewed as a whole, the evidence does not come close to meeting the severe or pervasive

standard that defines a hostile work environment.  See, Colón-Fontánez v. Municipality of San

Juan, 660 F.3d 17, 43-45 (1st Cir. 2011)(that supervisor refused to meet with plaintiff, avoided her,

yelled at her and a coworker in front of other employees, did not take action against employees who

made comments about plaintiff, and followed her or asked another employee to follow her if

plaintiff left her desk to go to the bathroom considered insufficient to establish a hostile work

environment even coupled with allegations of temporary removal of plaintiff's telephone and

computer, which required plaintiff to complete her work manually, and not inviting her to attend a

workshop); Plautz, 158 Fed.Appx. at 814-815, 817-819 (that maintenance manager instructed

plaintiff's supervisor to give plaintiff a reprimand for drinking coffee on the work floor; same

manager saw plaintiff viewing a nonwork-related website on the office computer, printed the page

that plaintiff was viewing, and showed it to plaintiff's supervisor, who, on manager's direction

wrote an investigatory report about the incident; supervisor orally reprimanded plaintiff as to proper

radio etiquette; when plaintiff returned to work from a stress leave, employer chastised him by

telling him he had started an epidemic of people taking stress leave; supervisor told plaintiff that

employer was going through his medical records trying to find a way to discredit him and supervisor

felt that maintenance manager was stalking plaintiff by hanging around plaintiff's work area and

watching him, did not amount to a hostile work environment).

At most, like in Colón-Fontánez, the incidents plaintiffs complain about were "episodic, but

not frequent in nature; upsetting, but not severe; mildly humiliating, but not physically threatening."

Colón-Fontánez, 660 F.3d at 44-45.[23]  Compare this situation with the one described in Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77 (1st Cir. 2018), where the plaintiff was subjected to a hostile work environment, as part of which she was taunted about her age nearly every single day for over two years: she was called "vieja" (Spanish for "old"), told that she was "useless;" was chastised for supposedly lacking the skills necessary to adequately fulfill the roles of her job because her age rendered her "slow;" was told that given her age, she should seek social security benefits, with the suggestion that because she was perceived as being too old for the job, she should resign before being forcibly discharged; and was yelled and screamed at).  Id. at 93.  But nothing of that sort happened here.

On top of this, there has been no showing that the incidents plaintiffs complain about negatively affected Mr. Ríos' work performance, a factor that undercuts the viability of their claim. See, Pomales v. Celulares Telefónica, 447 F.3d 79, 84 (1st Cir. 2006)(summary judgment dismissing hostile work environment claim in part because there was no evidence that the complained of conduct negatively affected plaintiff's ability to work); Bhatti, 659 F.3d at 74 (similar, as plaintiff "pointed to no effect whatsoever on her work performance"); Rodríguez-Cruz v. Stewart Title Puerto Rico, Inc., 209 F.Supp.3d 427, 444 (D.P.R. 2016)(rejecting hostile work environment action in part because there was no evidence that emails in question caused any impediment to plaintiff's performance of her work duties).  Contrast this scenario with the one in Marrero, where the First Circuit upheld a hostile work environment verdict in which repeated sexual harassment led to decreased performance.  See, Marrero, 304 F.3d at 19-20.

---

[23] The conclusion stands even with respect to Mr. Ríos' allegation that Sgt. Ramos prohibited him from having a snack in the guard posts when working four-hours shifts, for Mr. Ríos did it anyway.  See, Morales-Valladares, 605 F.3d at 37 (plaintiff not harmed by selective enforcement of coffee/lunch break policy, as he was not formally disciplined for violating the policy).

With it all, what plaintiffs have presented lacks references to Mr. Ríos' alleged disability, a fatal gap in their case. Generally, disagreeable behavior and discriminatory animus "are different things." Brader v. Bogen Inc., 983 F.3d 39, 64 (1st Cir. 2020). Everyone can be in some way characterized by age, ethnicity, disability, religion, sex and other characteristics, and some bosses may be "harsh" and "rude." Richards v. Dep't of Educ. of City of New York, 2022 WL 329226, *15 (S.D.N.Y. Feb. 2, 2022). So, to ensure that federal courts do not become super personnel boards, it is important in hostile work environment cases to exclude from consideration incidents that lack a nexus with the asserted ground of discrimination. See, Quiles-Quiles v. Henderson, 439 F.3d 1, 7-8 (1st Cir. 2006)(explaining that an employee claiming harassment must demonstrate that the hostile conduct was directed at him because of a protected characteristic).

By this measure, in order to sustain liability, otherwise actionable conduct must have been directed at Mr. Ríos because of his disability. But as noted above, there is no evidence to that effect. And that omission leads to dismissal. See, Brader, 983 F.3d at 63-64 (summary judgment dismissing ADA hostile work environment claim in part because the First Circuit has consistently acknowledged that toiling under a boss who is tough, insensitive, unfair, or unreasonable can be burdensome, but even to the extent that was the situation therein, plaintiff did not show that the immediate superior did not behave that way due to discriminatory animus); Medina-Rivera v. MVM, Inc., 713 F.3d 132, 138 (1st Cir. 2013)(summary judgment dismissing sex discrimination claim in part because nothing plaintiff said indicated that the phone call harassment was gender-based); Rivera v. Puerto Rico Aqueduct and Sewers Auth., 331 F.3d 183, 189-191 (1st Cir. 2003)(summary judgment dismissing religious harassment action, as there was no evidence that the offending conduct was linked to religious animus); Ahern v. Shinseki, 629 F.3d 49, 52, 59 (1st Cir. 2010)(observing in dismissing claim at summary judgment that insofar as plaintiffs' allegations

showed anything, it was that the officer administrator's conduct may have engendered a nerve-wracking environment, but not a nerve-wracking environment based on the protected characteristic, namely, gender).

Plaintiffs suggest that Sgt. Ramos made an improper comment along that line in the Coast Guard housing area. See, Docket No. 23-2, pp. 184-186.  For context, Capt. Caraballo wanted the guards to be acquainted with the people who lived in the housing area; the Coast Guard had a running club; the officers had to start running to prepare for a physical examination; someone asked Sgt. Ramos about that; and Sgt. Ramos said, "are you ready?," "[a]re you going to run?," "are you going practice shooting?," further stating "no, people who are out of shape and fat won't make it," which Mr. Ríos found offensive because he was the only one in the area who was fat.  Id.

The comment is not linked to any disability, and while it may have been insensitive, it was no more serious than what has been found insufficient to sustain claims of hostile work environment.  See, Colón-Fontánez, 660 F.3d at 43-45 (telling plaintiff on several occasions to get on social security or apply for disability so that she could receive assured checks; calling plaintiff hypochondriac; and claiming that she was "faking it" did not rise to the level of severity or pervasiveness required to sustain a claim of hostile work environment); Mohammadian v. Ciba Vision of Puerto Rico, Inc., 378 F.Supp.2d 25, 28, 31-32 (D.P.R. 2005)(that supervisor reprimanded plaintiff in front of colleagues; supervised her to the point of "persecution;" did not invite her to lunches with other employees; often commended negatively on her appearance; and made inappropriate references to her mental health problems such as "that depression is killing you," "you have to laugh," and "you are crazy, it shows," did not support hostile environment claim); Rivera, 331 F.3d at 185, 191 (giving plaintiff a birthday card with a pig wearing a rosary with her birth date emblazoned at the top insufficient to support religious harassment claim).

Mr. Ríos' working relationship with Sgt. Ramos may be characterized as tense, and Mr. Ríos found Sgt. Ramos' style unprofessional. But that does not lead to a different result here. See, Colón-Fontánez, 660 F.3d at 44 (observing that while the facts indicated an uncomfortable and tense working relationship between plaintiff and supervisor, a supervisor's unprofessional managerial approach is not the focus of discrimination laws). And the same may be said of Mr. Ríos' description of Sgt. Ramos as "rude" and "arrogant" (Docket No. 23-2, p. 195).[24] Arrogance and rudeness go beyond what makes a work environment hostile under the law. See, Patton v. Indianapolis Public School Bd., 276 F.3d 334, 339 (7th Cir. 2002)(dismissing hostile work environment action predicated on allegations that immediate supervisor treated plaintiff in a rude, abrupt, and arrogant manner, as those allegations fell short of showing an actionable hostile work environment).

Antidiscrimination laws were not enacted to create or enforce a "general civility code." Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005). The workplace "is not a cocoon," and those who labor in it are expected to have reasonably thick skins to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world. Colón-Fontánez, 660 F.3d at 45. In consequence, though Mr. Ríos' work environment may have been unpleasant and even subjectively "hostile" by some sense of the word, the hostile work environment claim must be dismissed.[25]

---

[24] Even more, on this topic, Mr. Ríos testified that he shared Officer Nieves' opinion that Sgt. Ramos was "garbage" (Docket No. 23-2, p. 195).

[25] Plaintiffs allege that Centerra knew of Sgt. Ramos' harassment but failed to take remedial action (Docket No. 40, p. 22). Centerra investigated Mr. Ríos allegations, concluding there was no harassment. The discussion shows there was no hostile work environment. That being so, there was no legal need for a remedial action. When an employee "complains about inappropriate conduct that does not rise to the level of a violation of law, there is no liability for a failure to respond." Álvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 419 (8th Cir. 2010)(citing in part EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498, 521 (6th Cir. 2001)).

D.      **Retaliation**

Plaintiffs assert that Centerra retaliated against Mr. Ríos under the ADA (Docket No. 40, p. 22).[26]   The ADA makes it illegal for employers to retaliate against someone because he has "opposed any act or practice made unlawful" by the ADA or because such individual "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA.  Carreras v. Sajo, García & Partners, 596 F.3d 25, 35 (1st Cir. 2010).  An ADA plaintiff may assert a claim for retaliation "even if [he] fails to succeed on a disability-discrimination claim."  Echevarría, 856 F. 3d at 133.

In the absence of direct evidence of retaliation, courts evaluate ADA retaliation claims under the burden-shifting framework drawn from McDonnell Douglas, 411 U.S. at 792.  In line with this framework, to establish a prima facie case of retaliation plaintiff must show that: (1) he engaged in protected conduct; (2) he experienced an adverse employment action; and (3) there was a causal connection exists between the protected conduct and the adverse employment action.  See, Kelley v. Correctional Medical Services, Inc., 707 F.3d 108, 115 (1st Cir. 2013)(identifying elements of prima facie case).

Once the plaintiff has made a prima facie showing of retaliation, the defendant "must articulate a legitimate, non-retaliatory reason for its employment decision."  Kelley, 707 F.3d at 115.  The employer's burden "is one of production, not persuasion."  Carreras, 596 F.3d at 36.  If the defendant meets this burden, the plaintiff must show that the proffered legitimate reason is pretextual and that the job action was the result of the defendant's retaliatory animus.  Id.  For an employment action to be considered adverse, "a reasonable employee would have found the

---

[26] Contrary to the ADA, Law 44 does not carry "a cause of action for retaliation."  Figueroa-Carrasquillo v. Axiscare Health Logistic, Inc., 2018 WL 8619913, *16 (D.P.R. Jul. 30, 2018).

challenged action materially adverse." Colón-Fontánez, 660 F.3d at 36.  In this context, that means showing the action might have "dissuaded" a reasonable worker from engaging in the protected activity.  Gómez-Pérez v. Potter, 452 Fed.Appx. 3, 8 (1st Cir. 2011).  To satisfy the requirement, the action must produce "a significant," not a trial harm.  Colón-Fontánez, 660 F.3d at 36.  This is an "objective standard."  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  Petty slights, minor annoyances, and simple lack of good manners are not normally considered materially adverse.  Id.

First, plaintiffs direct the court to a conversation that Mr. Ríos had with Lt. López in October 2018; to the prohibition on using the parking slots close to the rest house; and to the admonition about not consuming snacks while on the guard posts, which, they say, link protected activity to adverse actions (Docket No. 40, pp. 26-27).  As to the first event, on October 24, 2018, Mr. Ríos complained to Lt. López that Sgt. Ramos spied on him in the rest house on October 19, 2018; was not professional in handling the situation; and had no evidence (on presumably, that Mr. Ríos had been sleeping in the bathroom) (Docket No. 23-2, p. 78).[27]  In response, Lt. López told Mr. Ríos that he could not use the bedroom to get changed.  Id.[28]  The sequence shows neither a protected

---

[27] Plaintiffs allege that Mr. Ríos told Lt. López that Sgt. Ramos spied on him on October 19, 2018, while he was at the bathroom of the housing restroom area, where Mr. Ríos was checking his blood glucose levels, and reprimanded Ríos because he supposedly was sleeping in the bathroom and was walking around in his underwear, which, according to Ríos, he was not (Docket No. 40, p. 26).  They add that at the time he spoke to Lt. López, Mr. Ríos complained about Sgt. Ramos' disability harassment.  Id.  That is not what Mr. Ríos answered during his deposition in response to a direct question: "And what specifically was your complaint about Ramos?  (Docket No. 23-2, p. 78), to which Mr. Ríos answered, "His ways, and, you know, spying on me.  He is not being professional handling the situation.  And you know, also, he has got no evidence" (Docket No. 23-2, p. 78).  Allegations and argument do not serve to contradict deposition testimony.

[28] Plaintiffs allege that Lt. López told Mr. Ríos that he could no longer use the restroom and bathroom to get changed and check his blood glucose levels (Docket No. 40, pp. 26-27).  That is not what Mr. Ríos answered during the deposition in response to a direct question: "What did he [Lt. López] tell you specifically?" (Docket No. 23- 2, p. 78), to which Ríos answered, "That I can't use the bedroom upstairs to get changed."  Id.  There is nothing in that testimony about not using the bedroom to check blood glucose levels.  Allegations and argument do not serve to contradict deposition testimony.

activity nor an adverse action.  From what Mr. Ríos told Lt. López, he was not opposing an act or practice made unlawful by the ADA or making a charge, testifying, assisting or participating in any manner in an investigation, proceeding, or hearing under that statute.  And prohibiting Mr. Ríos to use the bedroom to change was not materially adverse.

Second, plaintiffs refer to the fact that in December 2018, Mr. Ríos wrote two letters to Centerra's management, and on December 27, 2018, he was reprimanded for his handling of a loaded firearm (Docket No. 23-2, p. 27).  In the first letter, Mr. Ríos essentially states that during the shift of December 19th, his primary job was to give breaks to every officer on the shift; Sgt. Ramos ordered him to park in the new employee parking lot when giving breaks at the CGX; Mr. Ríos proceeded to enter through the exit because employees entered the same way; at the end of the shift Sgt. Ramos said that Officer Cortés told him that Mr. Ríos had said that Capt. Caraballo expressed something to the effect that he authorized Mr. Ríos' actions; Mr. Ríos told Sgt. Ramos that he was wrong because that comment did not come from Mr. Ríos' mouth; and Mr. Ríos confronted Officer Cortés, who said that Sgt. Ramos was making things up because he wanted Mr. Ríos out (Docket Nos. 23-2, pp. 107-108; 23-13).

This was not protected activity under the ADA and the reprimand was a form of targeted constructive criticism that would not have dissuaded a reasonable worker from engaging in protected activity.  See, Wei v. Pennsylvania, 2019 WL 1403458, *3 (M.D. Pa. Mar. 28, 2019)(two reprimand letters that did not result in any change to plaintiff's duties, assignments, compensation or any other terms or conditions of employment did not qualify as adverse action sufficient to support retaliation claim); Buttler v. Exxon Mobil Corp., 838 F.Supp.2d 463, 496 (M.D. La. Jan.

20, 2012)(workplace criticism not adverse employment action for purposes of retaliation).[29]  In the same way, chastisement by superiors does not rise to level of material adversity but instead falls into the category of "petty slights, minor annoyances, and simple lack of good manners" that the Supreme Court has recognized are not actionable retaliatory conduct.  Stewart v. Mississippi Transp. Comm'n, 586 F.3d 31, 332 (5th Cir. 2009).

In the second letter, Mr. Ríos states that Sgt. Ramos described him to Sup. Méndez as a "problematic person;" over a month earlier Mr. Ríos had taken the problem to his superiors thinking that they would talk to Sgt. Ramos and put a stop to it; on December 20th, Sgt. Ramos told Mr. Ríos to cover the six meal-break posts in 2 and a half hours and followed him, asked him why he was running late and offered him doughnuts, an action that Mr. Ríos found funny because Sgt. Ramos had once scolded him saying that there was to be no consumption of anything at the post even though at times Mr. Ríos needed a bite because he was diabetic and his sugar levels varied (Docket No. 23-14).

In addition, the letter expressed that Sgt. Ramos should answer the radio when called upon for assistance in a timely manner, and that even though sometimes the problem could be a radio malfunction or connection, there was a pattern of not answering, especially if the subject was not liked, which was unprofessional and created a safety issue.  Id. at p. 3.  As the letter mentions that Mr. Ríos was diabetic and his glucose levels varied as part of the description of Sgt. Ramos' prohibiting him from having a snack on the guard post, the court will construe the letter as protected activity.  But Centerra articulated a legitimate reason for the reprimand, which plaintiffs could not

---

[29] Compare with, Burlington Northern, 548 U.S. at 53, where the Supreme Court held that the plaintiff suffered a materially adverse action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination because her job duties were substantially changed to less desirable and less prestigious and she was suspended without pay for 37 days. Id. at 69-71.

discount as pretextual.  Besides, that reprimand does not rise to the category of a material adverse

action in this context.

Third, plaintiffs argue that Mr. Ríos engaged in protected activity when in late December

2018 or early January 2019 he met with Capt. Caraballo and Mr. Handel, shortly thereafter, less

than two months after the meeting he was terminated from his employment, and when an adverse

personnel action occurs so close in time to the employer's knowledge of the protected activity, a

jury may infer causation purely from this temporal proximity (Docket No. 40, pp. 27-28).  The First

Circuit has acknowledged that timing "may bear on the question of causation in a retaliation claim

but has warned that a narrow focus on the timing, may ignore "the larger sequence of events and

also the larger truth."  Freadman v. Metropolitan Property and Cas. Ins. Co., 484 F.3d 91, 100-101

(1st Cir. 2007).

Pointedly, the larger truth is that, like under Title VII, ADA retaliation claims are subject to

but-for causation.  See, E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 767(6th Cir. 2013)(applying

but-for causation standard to retaliation claim under the ADA); TB v. San Diego Unified School

District, 606 F.3d 451, 472-473 (9th Cir. 2015)(similar); Seaman v. CSPH, Inc., 179 F.3d 297, 301

(5th Cir. 1999)(same).[30]   The standard is drawn from tort law, under which an action "is not

regarded as a cause of an event if the particular event would have occurred without it."  Univ. of

Texas v. Nassar, 570 U.S. 338, 347 (2013).

As relevant, the protected activity would be the but-for cause for termination if the employee

"would have remained in [his] position" had no protected activity occurred.  Finnie v. Lee County,

---

[30] See also, Palmquist v. Shinseki, 689 F.3d 66, 68 (1st Cir. 2012)(holding that "but-for" causation standard applies to retaliation claims under Rehabilitation Act of 1973); Doan v. San Ramon Valley Sch. Dist., 2014 WL 296861, *3 (N.D. Cal. Jan. 27, 2014)(requiring a "but-for" causal link between the protected activity and the adverse employment action, given that ADA retaliation claims are subject to the same framework of analysis as that of Tittle VII).

541 Fed.Appx. 368, 371-372 (5th Cir. 2013); Gallaher v. San Diego Unified Port Dist., 14 F.Supp.3d 1380, 1387 (S.D. Cal. 2014)(explaining concept).  Yet, this standard is not satisfied "by temporal proximity alone."  Staley v. Gruenberg, 575 Fed.Appx. 153, 156 (4th Cir. 2014); Hernandez v Yellow Trans. Inc., 670 F.3d 644, 660 (5th Cir. 2012)(similar); Ford Motor Co., 782 F.3d at 767 (same).  As the First Circuit has recognized, although "close temporal proximity may suffice for prima facie case of retaliation, it does not, standing alone, satisfy [plaintiff's] ultimate burden to establish that the true explanation for [his] firing was retaliation for engaging in protected conduct rather than the reasons articulated by [the employer]."  Echevarría, 856 F.3d at 138 (quotation marks and brackets omitted).

Viewed through this prism, plaintiffs fall short of demonstrating pretext for retaliation. During his meeting with Capt. Caraballo and Mr. Handel, Mr. Ríos did not ask for a specific accommodation.  He spoke about his medical conditions and, upon Mr. Handel's instructions, Capt. Caraballo would provide to Mr. Ríos a document to be filled by Mr. Ríos' doctors.  That being the case, participation in the meeting may be considered protected activity.  But the record does not sustain the thesis that Mr. Ríos' termination would not have occurred in the absence of that activity. The evidence points us far from it, given that in February 2019, Lt. López found Mr. Ríos sleeping on the job, and it was that incident, not the meeting, that resulted in his termination.

In this light, there is no bridge –no nexus– linking the meeting with the termination as when, say, decision-makers conspire to fire an employee by creating a paper trail of "trumped up" disciplinary charges.  Staley, 575 Fed.Appx. at 156.  Along that axis, see, Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 271 (1st Cir. 2014)(supervisor's actions served as a proximate cause of plaintiff's discharge because she gathered information on plaintiff's performance; threatened him that if he did not engage in a romantic and sexual relationship with

her she would manage to undercut him at work and get him fired; and when plaintiff rebuffed her, the supervisor set to carry out her threat).  However, that is not what happened in this case.  Nothing in the record unveils any ulterior retaliatory motive.  Thus, the ADA retaliation claim must be dismissed.  See, Alvarado v. Donahoe, 687 F.3d 453, 464-465 (1st Cir. 2012)(summary judgment dismissing retaliation claim because even though an interval of approximately one week between protected conduct and suspension was sufficiently close temporal proximity to warrant a prima facie inference of a causal connection between the two events, plaintiff could not overcome the defendant's asserted non-retaliatory reason for the suspension); Echevarría, 856 F.3d at 138 (summary judgment dismissing retaliation claim predicated on close temporal proximity of one day between protected activity and termination, as the proximity did not establish that the true explanation for termination was retaliation for engaging in protected conduct rather than the reasons that the employer set forth).[31]

### E.    Law 115

Plaintiffs allege that Centerra retaliated against Mr. Ríos in violation of Law No. 115 (Docket No. 40, pp. 29-30).  Law 115 makes it unlawful for an employer to discharge, threaten, or discriminate against an employee who has: (1) offered or attempted to offer testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico; or (2) provided or attempted to provide testimony, expression or information in internal procedures the company has established or before any employee or representative in a position of authority, provided the expression is not of a defamatory character or constitutes disclosure of privileged information

---

[31] See also, Carreras v. Sajo, García & Partners, 596 F.3d 25, 29, 38 (1st Cir. 2010)(summary judgment dismissing retaliation claim based on four-day temporal proximity between events, for even though such proximity may suffice for a prima facie case of retaliation, it did not satisfy plaintiff's ultimate burden to establish that the true explanation for the firing was retaliation for engaging in protected activity rather than for poor performance).

established by law.  See, P.R. Laws Ann. tit. 29, § 194a(a) (so providing).  The second proviso was inserted in the statute by way of Law No. 169 of September 29, 2014.  Prior to the enactment, "it did not enter into the retaliation calculus under Law 115."  González-Santiago v. Baxter Healthcare S.A., 2021 WL 1208207, *39 (D.P.R. Mar. 29, 2021).

In its application, absent direct evidence of retaliation –and there is none here– to set out a prima facie case under Law 115, a plaintiff must show that he: (1) participated in an activity protected by the statute; and (2) was subsequently discharged or otherwise discriminated against. See, Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 45 (1st Cir. 2010)(articulating test). If the plaintiff succeeds in this showing, the employer must articulate a "legitimate reason" for the challenged action.  Rivera-Rodríguez v. Sears Roebuck de Puerto Rico, Inc., 367 F.Supp.2d 216, 230 (D.P.R. 2005).  Should the employer do so, the plaintiff bears the burden of demonstrating that the reason asserted for the action is a pretext for retaliation.  Id.

In this way, claims under Law 115 related to the ADA are analyzed as "ADA retaliation claims."  Caez-Fermaint v. State Ins. Fund Corporation, 286 F.Supp.3d 302, 320 (D.P.R. 2017).  In fact, plaintiffs direct the court to their ADA retaliation claim analysis, incorporating it as part of their Law 115 argument (Docket No. 40, pp. 29-30).  That being so, based on the analysis of plaintiffs' ADA retaliation claim, the Law 115 claim must be similarly dismissed.  See, Caez-Fermaint, 286 F.Supp.3d at 320 (disposing of Law 115 claim on this basis); Rivera-Rodríguez, 367 F.Supp.2d at 230 (similar).[32]

_____

[32] Incidentally, conterminous analysis of Law 115 claims with Title VII retaliation claims leads to the same result.  See, Ríos v. Municipality of Guaynabo, 938 F.Supp.2d 235, 259 (D.P.R. 2013)(noting that because plaintiff's Title VII retaliation claim lacked merit, the Law 115 claim suffered the same fate); Godoy v. Maplehurst Bakeries, Inc., 747 F.Supp.2d 298, 318 (D.P.R. 2010)(granting summary judgment as to the Law 115 claim given that it had been granted with respect to the Title VII retaliation claim); Rodríguez-Candelario v. MVM Security Inc., 238 F.Supp.3d 240, 262 (D.P.R. 2017)(similar).  And an identical conclusion follows with respect to ADEA retaliation and Law 115.  See, Baerga-Castro v. Wyeth Pharm., 2009 WL 2871148, *13 (D.P.R. Sept. 3, 2009)(considering that plaintiff adduced no

### F.     Puerto Rico Constitution

Plaintiffs allege that Centerra violated Article II, Sections 1, 8 and 16, of the Puerto Rico Constitution (Docket No. 40, p. 30).  As relevant, Section 1 states that the dignity of the human is inviolable; all men are equal before the law; no discrimination shall be made on account of race, color, sex, birth, social origin or condition, or pollical or religious ideas; and both the laws and the system of public education shall embody these principles of essential human equality.  See, P.R. Laws Ann. tit. 1, Bill of Rights, Art. II, § 1.  Section 8 provides that every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life.  Id., § 8.  Section 16 recognizes in part the employees' right to protection against risks to their health in their work or employment.  Id., § 16.

The Puerto Rico Legislature has enacted legislation to implement the equality and non-discrimination principles embodied in Section 1, and the safe-workplace provision set in Section 16.  As for Section 1, without being exhaustive, pertinent enactments include Law 100, P.R. Laws Ann. tit. 29, § 146 et seq., which prohibits employment discrimination because of age; race; color; sex; sexual orientation; gender identity; social or national origin; social condition; political affiliation; political or religious beliefs; for being a victim or being perceived as a victim or domestic violence, sexual assault or stalking; or for being a servicemember, ex-servicemember, serving or having served in the United States Armed Forces, or holding veteran status; Law 17 of April 22, 1988, P.R. Laws Ann. tit. 29, § 155 et seq., which prohibits sexual harassment in employment; Law 69 of July 6, 1985, P.R. Laws Ann. tit. 29, § 1321 et. seq., which prohibits

---

significantly probative evidence to support retaliation claim under the ADEA, it was appropriate to enter summary judgment dismissing Law 115 claim as well).  Even if the ADA and Law 115 were not conterminous, the Law 115 claim would fail on its own, given the absence of discrimination and the non-pretextual nature of the reason for Mr. Ríos' termination.

discrimination in employment on the basis of sex or gender; Law 44 of July 2, 1989, P.R. Laws

Ann. tit. 1, § 501 et. seq., which as noted above, prohibits disability discrimination; and Law 115,

P.R. Laws Ann. tit. 29, § 194 et. seq., which as discussed earlier, prohibits retaliation against

employees for engaging in protected activity.[33] See, Erazo-Vázquez v. State Indus. Products Corp.,

2021 WL 3910248, *24 (D.P.R. Aug. 31, 2021)(explaining that the Puerto Rico Legislature enacted

antidiscrimination statutes to implement the principle of human equality set in Section 1 of Article

II of the Bill of Rights of the Constitution) (citing in part Meléndez v. Asoc. Hosp. del Maestro,

156 D.P.R. 828, 864-865 (2002)).  Plaintiffs failed to demonstrate that Centerra infringed upon any

of these provisions.

In connection with Section 16, without being exhaustive, the Legislature enacted the

Occupational Safety and Health Act, Law No. 16 of August 5, 1975, P.R. Laws Ann., tit. 29, § 361,

et. seq., requiring employers to provide a workplace free of risks to the employee's health; and the

Temporary Disability Benefit Act, Law 139 of June 26, 1968, P.R. Laws Ann. tit. 11, § 201, et.

seq., which provides benefits to employees temporarily disabled to perform the duties of their job

on account of non-occupational injury or illness.  See, Erazo-Vázquez, 2021 WL 3910248, at *24

(so recognizing).  In addition, the Legislature maintained in effect, with amendments, the pre-

constitution Workers Accident Compensation Act, Law 45 of April 18, 1935, P.R. Laws Ann. tit.

11, § 1, et. seq., which provides worker compensation benefits to employees who suffer an

occupational injury or illness.  See, Erazo-Vázquez, 2021 WL 3910248, at *24 (citing García v.

Aljoma, 162 D.P.R. 572, 584 (2004)(noting that Law 16, Law 45 and Law 139 implement

constitutional provisions embedded in Bill of Rights) and Cuevas v. Ethicon Div. of J&J Prof. Co.,

---

[33] The Legislature also prohibited pregnancy discrimination in a pre-constitution statute, Law 3 of March 13, 1942, P.R. Laws Ann. tit. 29, § 467 et. seq., which has remained in effect after the Constitution became effective in 1952.

148 D.P.R. 839, 845 (1999)(observing that Law 45 implements rights included in Section 16 of Article I)).

Plaintiffs did not show the employer violated any of these statutes.  Nonetheless, they allege that Centerra violated Section 16 by denying Mr. Ríos of the opportunity to consume food on post, and by depriving him of a place where he could check his blood glucose levels (Docket No. 40, p. 32).  Assuming the "free-of-risk" workplace provision plaintiffs rely on applies in absence of legislation, it was not infringed upon, for Mr. Ríos consumed snacks while working, and he was not prevented from using the bathroom in the safe house to check glucose levels.  In fact, plaintiffs admit that Mr. Ríos was in the bathroom checking his blood sugar levels when Sgt. Ramos allegedly spied on him (Docket No. 40, p. 22)("Ramos further spied on Ríos while he was in the bathroom checking his blood sugar levels").  And there is no evidence that Lt. López or anybody else denied Mr. Ríos permission to use the room to check on his blood glucose levels either.

With regard to Section 8, this Section operates *ex proprio vigore*, such that protection against abusive attacks against a person's honor, reputation and private and family life may be enforced between private parties, not only against the State.  Rivera-Cartagena v. K-Mart Puerto Rico, Inc., 767 F.Supp.2d 310, 322 (D.P.R. 2011).  In the employment scenario, the right to privacy may be infringed upon when the employer places limitations on an employee's ability to make decisions about his private or family life; engages in indiscriminate dissemination of private or personal information; indiscriminately disseminates false or slanderous information; or unreasonably impinges upon the employee's personal or family tranquility.  See, Rivera-Rosa v. Citibank, N.A., 567 F.Supp.2d 289, 302 (D.P.R. 2008).  Plaintiffs have not shown that the employer transgressed any of these boundaries.  While they assert that Centerra violated Mr. Ríos'

constitutional right to privacy and dignity when Mr. Ramos "spied" on Mr. Ríos, as discussed above, Mr. Ríos was not spied on.[34]

### G.       Article 1802 of the Civil Code

Mr. Ríos' spouse –Lynne M. Sheridan– has brought a claim under Puerto Rico's general tort statute, Article 1802 of the Commonwealth's Civil Code, P.R. Laws Ann. tit. 31, § 5141, alleging to have suffered damages as a result of Centerra's actions toward her husband (Docket No. 40, p. 32).  Article 1802 provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obligated to repair the damage so done."  Id.  The Puerto Rico Supreme Court has held that in certain circumstances, "relatives of a person who has been the victim of workplace discrimination may bring claims under Article 1802 to be compensated for any harm to them resulting from the discrimination." Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 15 (1st Cir. 2012).

Yet, those claims are "derivative of the principal plaintiff's claim" in that they are premised on some harm to the principal plaintiff, and if the principal plaintiff's claim fails, "so too does the relative's derivative claim." Pagán-Colón, 697 F.3d at 15.  As Ms. Sheridan's claim derives from and hinges on Mr. Ríos' claims and those claims do not survive, Ms. Sheridan's derivative claim

---

[34] It is worth considering the present case in light of Segarra-Hernández v. Royal Bank de Puerto Rico, 145 D.P.R. 178 (1998)(English-language translation of which is included as Appendix I), where the plaintiff complained about a series of internal transfers and memoranda that she deemed offensive.  Id. at 2-3, 12 (describing factual setting).  After reviewing the evidence, the Puerto Rico Supreme Court held that her treatment by the employer did not rise to the level of a constitutional violation because it did not involve the indiscriminate dissemination of false or slanderous information or of private or personal information, limitation of plaintiff's faculty to make decisions about her private or family life, or an unreasonable impingement on her personal or family tranquility.  Id. at p. 12.  Among other things, the evidence did not reveal anything that could be regarded as insults or humiliation even though on several occasions, the assistant to the vice-president referred to plaintiff in private conversations as being fat.  For the Supreme Court, the comments merely reflected unprofessional and morally reprehensible conduct, not conduct that transgressed constitutionally protected limits.  Id.  This was so notwithstanding the fact that the employee developed a disabling work-related condition for which she received treatment.  Id. at 15.  Likewise, the evidence was insufficient to show that the employer's actions injured plaintiff's constitutional right to the protected against abusive attacks on her honor and personal reputation.  Id.  Applying the same yardstick, it is apparent the present case is nowhere near the boundary beyond which liability may be imposed for infringement of Mr. Ríos' constitutional right to privacy.

Sheridan v. Centerra Group, LLC
Civil No. 19-2036 (PAD)
Opinion and Order
Page 47

under Article 1802 must be dismissed.  See, Quiñones-Irizarry v. TLD de Puerto Rico, 217

F.Supp.2d 194, 199 (D.P.R. 2002)(dismissing spouse's Art. 1802 derivative claim upon dismissal

of principal plaintiff's discrimination claim); Rivera-Rodríguez, 367 F.Supp.2d at 230 (similar).

## IV.    CONCLUSION

For the reasons stated, Centerra's motion for summary judgment (Docket No. 24) is

GRANTED and the case DISMISSED.  Judgment shall be entered accordingly.

**SO ORDERED**.

In San Juan, Puerto Rico, this 31st day of May, 2022.

s/ Pedro A. Delgado-Hernández
PEDRO A. DELGADO HERNANDEZ
U.S. DISTRICT JUDGE